**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Helen Haymer, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Countrywide Bank, FSB; Countrywide Home | ) |
| Loans, Inc.; Bank of America; Valor Financial | ) |
| Services, LLC; Marilyn J. Cieslak; and John | ) |
| Does 1 – 5, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

1.      Plaintiff Helen Haymer – an elderly, African-American, widow on a fixed income -  brings this action against a subprime mortgage lender and its mortgage broker for damages suffered from egregious predatory lending practices, including fraud, improvident lending, and discrimination based on age, sex, race and the location of her home.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§1331 (general federal question), 1337 (interstate commerce), 15 U.S.C. § 1679b (Credit Repair Organizations Act), 12 U.S.C. Sect. 2601, et seq. and 1367 (supplementary jurisdiction).

3.      Defendants all transact business in the Northern District of Illinois and are deemed to reside here.

## PARTIES

4.      Helen Haymer is a financially unsophisticated, 73-year-old widow on a fixed-income who resides in a home that she has owned for 39 years.  Ms. Haymer is African-

American and female.  She has limited education.  Her home is located in a predominantly

African-American neighborhood on Chicago's south side - at 7924 South Kimbark Avenue,

Chicago, IL, 60619.  The property is her only residence.

5.      Plaintiff Countrywide Bank, FSB ("Countrywide Bank" or

"Countrywide"), is a federally insured savings bank with headquarters located at 1199 N. Fairfax

Street, Suite 500, Alexandria, Virginia, 22313.  It is a residential mortgage lender that does

business throughout the U.S., including in Illinois.  Countrywide Bank is a subsidiary of

Countrywide Financial Corporation ("CFC"), a diversified financial services company, which

also does business throughout the U.S., including in Illinois.  Countrywide Bank, FSB, was the

originating creditor of defendant's loan, as detailed below.

6.      Defendant Countrywide Home Loans, Inc., ("Countrywide Home Loans"

or "Countrywide"), is a residential mortgage lender with its principal place of business at 4500

Park Granada Blvd., Calabasas, California, 91302.  It is also a subsidiary of CFC.  Countrywide

Home Loans does business in Illinois.  Its registered agent name and address are Prentice Hall

Corporation, 33 North LaSalle Street, Chicago, IL 60602.  On information and belief,

Countrywide Home Loans was the originating creditor and the legal holder of defendant's 2008

loan.  The two Countrywide defendants are collectively referred to below as "Countrywide."

7.      On information and belief, the current assignee or legal and beneficial

owner of defendant's 2009 loan is Bank of America ("BOA").  The current servicer is BAC

Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing, LP.  BOA acquired the

Countrywide family of companies - including their assets and liabilities - for $4 billion in early

2008.

8.     Valor Financial Services ("Valor") is an Illinois corporation engaged in the business of a arranging or brokering residential mortgage loans.  Its registered agent and registered agent's address are:  Marilyn J. Cieslak, 1911 Rohlwing Road, Suite A, Rolling Meadows, Illinois 60008.  On information and belief, Ms. Cieslak is Valor's sole owner and works as a loan officer or mortgage consultant for Valor.  At all times, Cieslak was an agent of Valor.  Valor also has or had an office at 399 Quentin Road, #A, Palatine, IL 60067.

9.     Does1-5 are any additional legal and/or beneficial owners of defendant's loan whose identity or identities is/are currently unknown to her.  Information about the identities of such owners is rarely, if ever, a matter of public record.  Defendant will gather information about any additional or new owners in discovery.

10.     The Federal Housing Administration ("FHA"), a division of the U.S. Department of Housing and Urban Development ("HUD"), has guaranteed defendant's 2009 loan in the event of default, as set forth below.

## FACTS RELATING TO ALL DEFENSES AND CLAIMS

11.     As detailed below, on or about January 30, 2009, Countrywide Bank made a loan to Ms. Haymer in which the monthly repayment amount was 93% of her total monthly income.  This was a loan that – Countrywide knew at the time – Ms. Haymer could never afford, a loan that, it knew then - doomed her to default and foreclosure.

12.     Countywide Home Loans had just made an unaffordable loan to Ms. Haymer less than one year before.  Countrywide's 2009 loan refinanced its 2008 loan.

13.     Ms. Haymer has lived in her home continuously since she and her husband purchased it in 1971.

14.     Mr. Haymer was the spouse who took care of all of the couple's bills and financial business, including dealing with creditors and potential creditors.

15.     In 1997, Ms. Haymer's husband passed away.

16.     Ms. Haymer continued paying the mortgage on her own and, by or before 2001, she paid it off completely and owned her home free and clear.

17.     Increasingly, with Social Security retirement as her only income, Ms. Haymer struggled to maintain the house, pay utilities, and buy food and medicine.

18.     She had and has no other family members to help her.

19.     As a senior with 100% equity, Ms. Haymer was an excellent candidate for a reverse mortgage.

20.     However, starting in 2004, she was subjected to the first in a series of five separate predatory mortgage transactions - one per year for five consecutive years - all involving mortgage brokers of subprime loans and notorious subprime lenders, such as Indymac Bank, Washington Mutual and Countrywide.  Countrywide originated the most recent two consecutive transactions, the 2008 and 2009 loans.

21.     A large portion of the money drawn out of Ms. Haymer's property through these transactions never went to Ms. Haymer.  Much of it went to the brokers and lenders in the form of fees and interest.  Other portions of the loan proceeds are simply unaccounted for.

22.     The collective result of these transactions, including Countrywide's, has been to rob Ms. Haymer of all of the equity in her home and to leave her with a mortgage debt she cannot afford to repay.

23.     BAC now seeks to foreclose on the last of the five mortgage loans originated to Ms. Haymer, the 2009 loan.  A foreclosure action is pending in Cook County

Circuit Court as *BAC Home Loans Servicing, LP v. Haymer,* 2009 CH 036822.   This loan was originated as follows.

24.     In December, 2008, or early January, 2009, Ms. Haymer was referred to a mortgage broker, Valor Financial Services, by a "friend."

25.     Valor arranged a refinance mortgage loan for plaintiff from Countrywide Bank, FSB.

26.     Valor and Countrywide closed the loan on or about January 26, 2009.

27.     At the time, Countrywide was an FHA-approved lender.

28.     Countrywide's mortgage loan to plaintiff is an FHA-insured loan.

29.     The proceeds of the loan were used primarily for consumer, family and household purposes, namely, refinancing of prior debt incurred for those purposes.

30.     The following are true and accurate reproductions of the only documents plaintiff received in connection with the closing of the loan:

      a.     An unsigned loan application (Exhibit A);

      b.     An unsigned HUD-1 Settlement Statement (Exhibit B);

31.     Repeating, these are the only documents Ms. Haymer ever received in connection with the 2009 loan.  The rest of the closing documents were simply never provided to her.  Ms. Haymer never even received a copy of the 2009 note or mortgage until she was served with plaintiff's complaint and viewed the copies attached thereto.  Those versions are attached hereto as, respectively, Exhibits C and D.

32.     This glaring omission of written disclosure served to obscure and hide from Ms. Haymer (a) the loan terms and (b) the fact that she could not actually afford the

monthly repayments under the loan and still meet her subsistence needs to purchase food, medicine, water, electricity and gas.

33. The closing was held in her home, not in Schaumburg as represented on the HUD-1 (Exhibit B). On information and belief, closing was conducted by Marilyn J. Cieslak, Valor's owner. Cieslack was the only person defendant ever dealt with concerning the loan. Cieslack had two meetings with plaintiff prior to closing, both in plaintiff's home.

34. On closing day, Cieslak brought a single set of closing documents with her. Ms. Haymer signed them before Cieslak took them all away. But she just happened to have extra copies of the two documents she did give to her that day, and she gave her the unsigned copies.

35. Cieslak never provided a copy set of closing documents to Ms. Haymer at any time subsequently.

**Violations of the Illinois Fairness in Lending Act/Violations of FHA Regulations/Improvident Lending/**

36. Valor arranged and Countrywide originated a loan in the principal amount of $157,624.00.

37. According to the note attached to plaintiff's complaint, the monthly principal and interest payments under the loan are $846.16. However, with the required monthly payments to escrow for real estate taxes and insurance, Ms. Haymer's total monthly payment amount comes to $1,049.19. (See Exhibit C).

38. Ms. Haymer's only source of income at that time (as well as currently) was Social Security retirement. Her monthly benefit at the time was $1,125.00.

39.     That meant that, were she to pay her mortgage every month, she would only have $75.81 left over each month for food, medicine, utilities, transportation, maintenance of the home and other basic human needs.

40.     In industry parlance, her "front end" or mortgage debt-to-income ("DTI") ratio exceeded 93% and left her no disposable income.

41.     Ms. Haymer is also disabled and suffers from diabetes, asthma, hypertension and other chronic ailments which require money to care for and alleviate.

42.     A DTI this high is in direct violation of FHA underwriting guidelines and Illinois law that explicitly prohibit a lender from making a loan that it knows a borrower cannot afford to repay.

43.     It was impossible for Ms. Haymer to qualify for a loan with a 93% DTI in the absence of fraud by the broker and/or Countrywide.

44.     For instance, the FHA requires that all proposed loans pass the "net tangible benefit test," which requires, in part, that any proposed refinancing leave the borrower with adequate monthly savings compared with the repayment amount under their prior loan. There must be a net benefit after subtracting for the closing costs and other costs to the borrower/benefits to the lender.  In this instance, the gross monthly savings was over her prior loan repayment amount was just $28.00.

45.     Further, Valor arranged and Countrywide made what is called an FHA "streamline refinance" loan.  According to HUD's website, this type of loan requires low documentation of income and assets.  (<u>Exhibit D</u>).

46.     This provided an opportunity for Countrywide and/or its broker to commit fraud and also some cover for plausible deniability later in the event its fraud was discovered:  it could always point the finger at Ms. Haymer.

47.     Under FHA regulations, the lender and no one else is responsible for ensuring that a loan is originated in compliance with FHA regulations and guidelines.

### Fraud in the Inducement/Discrimination

48.     In fact, either Valor and/or Countrywide willingly did nothing whatsoever to verify Ms. Haymer's income, in violation of program guidelines or, more likely, they were well aware that she could not afford the loan but falsified and misrepresented her income in the application and underwriting process in order to get the loan approved.  They both stood to reap – and did reap – fees, commissions and profits if but only if the loan was approved, closed and funded.

49.     The unsigned loan application (Exhibit A), completed by Valor, contains nothing but blank space in the sections requiring information on the borrower's income and assets.  (Exhibit A, pp. 2-3).  The application was physically filled out by Cieslak, not plaintiff. The application lists a Scott Kuhl as the in-person interviewer, but that is false:  the only person plaintiff ever dealt with is Cieslak.

50.     Ms. Haymer is an honest, meek, and financially unsophisticated elder. She accurately and truthfully told the broker what her income was.  She does not recall that the broker ever asked her for any documentation to support her income.

51.     In fact, Valor, Cieslak and Countrywide singled out and exploited Ms. Haymer – through fraud and deception - on the basis of her age, race/geography and sex because they perceived that she was vulnerable.

52.     Plaintiff will garner additional documents in discovery in order to plead fraud with greater particularity.  She cannot be expected to plead with particularity when, as set forth above, the information and documents that would allow her to do so are in the sole control of plaintiff and third parties and when there has been no opportunity for discovery.

**Equity Stripping/Discrimination**

53.     Countrywide and Valor received all of the significant closing costs in the total amount of $850.  (Exhibit B, lines 812 and 813).

54.     In addition, through the efforts of Valor, Countrywide received a higher interest rate on the loan than the "par" interest rate that Ms. Haymer actually qualified for based on her objective credit characteristics.

55.     Countrywide compensated Valor for obtaining this higher rate for it with a yield spread premium ("YSP") in the amount of $2,167.33.  (Exhibit B, line 814).  This was Valor's and Cieselak's main source of compensation for the loan.

56.     Ms Haymer was made to finance the amount of the YSP in the form of the higher rate for Countrywide.  On information and belief, the YSP, which was 1.38% of the loan amount, resulted in a rate that was .5% to 1.0% higher than the rate Ms. Haymer actually qualified for.

57.     Defendants charged Ms. Haymer and other minorities, women and senior citizens defendants higher closing fees and YSPs on average (resulting in higher interest rates on average) than they charge their Caucasian, male and younger borrowers.

**Multiple Violations of the Truth in Lending Act**

58.     Moreover, defendant's 2009 loan violated the Truth in Lending Act ("TILA"), 15 U.S.C. §1601 et seq. ("TILA"), and Federal Reserve Board Regulation Z, 12 C.F.R. part 226, as follows.

59.     Ms. Haymer was not provided with any TILA disclosures whatsoever at any time – including the mandated preliminary and final TILA Disclosure Statements and the federal Notice of Right to Cancel forms.

60.     This served to obscure the loan terms and to hide from her the fact that she had a right under federal law to cancel the loan – all so that she would not be able to exercise that right.

### Multiple Violations of FHA Regulations Mandating Proactive Loss Mitigation

61.     FHA/HUD is the guarantor of the loan.

62.     Because Ms. Haymer's loan is FHA-insured, the loan's owner, believed to be defendant BOA, was and is subject to FHA regulations for pre-foreclosure loss mitigation, which are administered by HUD.

63.     Those regulations mandated that BOA or its servicing agent, BAC, engage in special loss mitigation efforts *before* the filing of a foreclosure action, in order to avoid foreclosure on defendant's home. 12 U.S.C. § 1715u(a); 24 C.F.R. § 203.500.

64.     The purpose of the FHA program is to expand homeownership for Americans.  The letter and spirit of the implementing regulations is that no mortgagee should commence foreclosure proceedings until it has documented that it has exhausted all alternatives to foreclosure.

65.     BOA flagrantly violated the FHA regulations in connection with Ms. Haymer's 2009 loan.

66. First, it did not take make any loss mitigation steps or interventions with respect to Ms. Haymer.

67. Second, on information and belief, it did not properly document, *before* initiating this foreclosure action, any loss mitigation evaluations that it did make or any resulting loss mitigations actions that it did take. This is an FHA program requirement.

68. Third, on information and belief, it did not provide a written certification to its foreclosure attorney stating that defendant is ineligible for all loss mitigation options *before* filing this foreclosure; if it did, under the circumstances, such certification would be false.

69. Fourth, BOA did not make any efforts whatsoever, let alone "reasonable efforts," as required, to arrange or hold a face-to-face interview with Ms. Haymer before three monthly installments were due and unpaid. Her first meeting with a housing counselor did not occur until long after she was in default and long after this action had been filed.

70. Specifically, plaintiff never received a certified letter or an in-person visit to her home requesting such an interview.

71. Specifically, BOA never, in any way, advised defendant of any alternatives to foreclosure, such as forbearance or loan modification. She learned of and applied for a federal loan modification on her own accord.

72. One can understand why BOA did not take any such steps. In fact, it has a powerful positive incentive to ignore its obligations to engage in loss mitigation and proceed with foreclosure: because the loan is federally guaranteed, it stands to get reimbursed for nearly 100% of the indebtedness, regardless of the value of the property.

73. Following closing in 2009, Countrywide transferred servicing rights to BAC, and BAC is believed to be the current servicer of the loan.

74. On information and belief, BAC is also the agent for the current owner of the loan, BOA.

75. In the event that BOA is not the current legal and beneficial owner, the current owner(s) are named as John Does 1-5.

76. In an effort to save her home, Ms. Haymer paid a "loan modification service fee" of $995.00 to a Florida company that represented it could get her loan modified. She did not get a modification.

### BOA Not a Holder in Due Course

77. On information and belief, BOA or the current owner does not have holder in due course status with respect to defendant's loan.

78. First, BOA was the ultimate owner of Countrywide Bank at the time the loan was originated.

79. Moreover, on information and belief, BOA or the putative current owner do not meet all of the UCC Article 3 requirements for holder in due course status.

80. Specifically, on information and belief, the note has not been properly negotiated and/or is not a negotiable instrument.

81. For instance, the note attached as <u>Exhibit C</u> (which comes from BAC's foreclosure complaint) is not properly endorsed in that it purports to be a copy of the certified original, but there is no indication of any endorsement whatsoever.

82. A "holder" is one who receives the instrument by endorsement on the note itself or on an "allonge" physically affixed to the note. Judging from <u>Exhibit C</u>, there is no endorsement physically affixed to plaintiff's note.

83.     Further, the usual practice of executing an assignment, as was done in the case of plaintiff's mortgage does, not make the recipient a "holder."

84.     Under Illinois law, an assignee of a note and mortgage who is not a holder in due course takes it subject to the same defenses and claims that existed between the original parties to the instrument.

85.     Moreover, in the alternative, even if BOA or the putative owner is a holder in due course, 810 ILCS § 5/3-305 provides that the owner is subject to the obligor's original defenses, which include fraud in the inducement.

86.     Consequently, the assignee of ownership is subject to all defenses and claims below, all of which could be asserted against the originating creditor.

## COUNT I - ILLINOIS FAIRNESS IN LENDING ACT (Improvident Lending)

87.     Plaintiff incorporates by reference all previous paragraphs as if full set forth herein.  This count is against all defendants.

88.     The Illinois Fairness in Lending Act prohibits any residential mortgage lender from engaging in Equity Stripping.

89.     Equity stripping is defined as "assist[ing] a person in obtaining loan secured by the person's principal residence for the primary purpose of receiving fees related to the financing when (i) the loan decreased the person's equity in the principal residence and (ii) at the time the loan is made, the financial institution does not reasonably believe that the person will be able to make the scheduled payments to repay the loan."

90.     The Act authorizes any person aggrieved under the Act to bring an action for actual damages and costs.

91.     As alleged above, Countrywide, Valor and Cieslak knew that plaintiff could not afford the repayments under the 2009 loan and that there was little or no benefit to the refinancing, and defendants underwrote the loan anyhow in order to reap profits in fees and interest income.

92.     In fact, defendants fraudulently underwrote the loan, knowing that it had willingly overlooked or falsified her income.

93.     The loan was secured by the mortgage on plaintiff's residence.  The loan had the effect of decreasing the equity in her property.

94.     At the time it originated the loan, no defendant reasonably believed that plaintiff could repay the loan.

95.     Rather, defendants' primary purpose in arranging/making the loan was to strip the equity out of plaintiff's property in the form of closing fees and costs and other charges.

WHEREFORE, the Court should:

a.      Void the note and mortgage in their entirety;

b.      Award actual damages;

c.      Reform the terms of the loan, order disgorgement of illegal profits, and/or grant other equitable relief;

d.      Award litigation and court costs; and

e.      Grant such other or further relief as the Court deems appropriate.

## <u>COUNT II – COMMON LAW FRAUD IN THE INDUCEMENT</u>

96.     Plaintiff incorporates all previous allegations as if set forth fully herein. This count is against all defendants.

97. Countrywide, Valor and Cieslak engaged in a course of conduct of fraud in the inducement consisting of numerous material misstatements and omissions concerning plaintiff's income and assets.

98. Without limitation, the fraudulent statements include: the implicit representation to plaintiff that she could afford the loan, which, in turn, was based on the fraudulent inflation of her income on the signed loan application or the knowing disregard of the fact that her income was insufficient to repay the loan. These misstatements were enhanced by deceptive acts, such as having plaintiff sign loan applications, large sections of which were blank, not giving plaintiff a copy set of the closing documents so that she could ascertain the terms of the loan and the repayment amount during the three-day rescission period (and possibly exercise her right to cancel) or at anytime.

99. Defendants knew that plaintiff could not afford the loan repayments or that the amount of income it put on the loan application was inflated and false or was reckless with respect to its truth or falsity.

100. Defendants intended for plaintiff to rely on these false statements. In this manner, it sought to induce her to take out the loan and/or not to cancel it.

101. Defendants' actions constituted gross fraud for which plaintiff is entitled to an award of punitive damages.

102. These misrepresentations and omissions concerned the material terms of the proposed transaction.

103. Plaintiff did, in fact, rely on the fraudulent misrepresentations and omissions. Under all the circumstances, her reliance was reasonable and justified.

104.    Plaintiff was injured as the result of defendants' intentionally false statements.

WHEREFORE, plaintiff requests that the Court:

        a.      void the note and mortgage;

        b.      award actual damages;

        c.      award punitive damages;

        d.      grant reformation, rescission , disgorgement of all profits and/or other equitable relief; and

        e.      grant such other relief as the Court deems appropriate.

## COUNT III - TRUTH IN LENDING ACT

105.    Plaintiff incorporates by reference paragraphs 1 – 86.  This Count is against Countrywide, BOA and John Does 1-5.

### Right to Rescind

106.    Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. Sect. 1635 and 12 C.F.R. Sect. 226.23.  Sect. 226.23 provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

**(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed**

for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

<u>**Grounds for Rescission**</u>

107.   In connection with the loan, defendants failed to provide plaintiff with the required financial disclosures at the time the loan was consummated, in violation of 15 U.S.C. Sect. 1637, 12 C.F.R. Sect. 226.18 and the corresponding sections of the Official Federal Reserve Board ("FRB") Commentary on Regulation Z.  It failed to provide defendant with any final TILA Disclosure Statement at any time.

108.   In addition, defendants provided plaintiff with no copies of the federal Notice of Right to Cancel form, in violation of TILA's requirement that this federal right be disclosed "clearly and conspicuously."

109.   Either of these two violations alone is sufficient to confer on plaintiff the extended, three-year right to rescind the loan.

110.   This pleading serves as sufficient notice to defendants that plaintiff is rescinding the loan.

111.   Under 15 U.S.C. Sect. 1641(c), the right to rescind may be exercised against "any assignee," including BOA or John Does 1-5.

112.   In addition, 15 U.S.C. Sect. § 1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in her favor and against defendants for:

a.   a judgment voiding defendants' mortgage, capable of recordation in the public records, and binding on defendants;

       b.      refund of all finance charges plaintiff has paid in connection with the loan, pursuant the TILA rescission formula;

       c.      statutory damages for each party's refusal to rescind;

       d.      equitable relief, as appropriate, including but not limited to appropriate time to tender, especially in view of defendants' fraud and improvident lending at origination;

       e.      attorney's fees, litigation expenses and costs; and

       f.      such other or further relief as the Court deems appropriate.

## COUNT IV – ILLINOIS CONSUMER FRAUD ACT

113.    Plaintiff incorporates by reference paragraphs 1-86 above as if set forth fully herein.  This claim is against Countrywide, Valor and Cieslak.

114.    In connection with Ms. Haymer's transaction and the subsequent assignment of ownership and servicing rights, defendants violated §2 of the Illinois Consumer Fraud Act, 815 ILCS § 505/2, by engaging in numerous unfair and/or deceptive and/or negligent acts and practices and conduct toward her, including but not limited to:  (a) making her a loan that it knew at the time she could not afford; (b) engaging in improvident lending; (c) implicitly misrepresenting to her that she could afford the loan; (d) overlooking or falsifying her income on her loan application and the fact that it was insufficient; (e) making her a loan with little or no net tangible benefit to her; (f) not providing copies of closing documents from which she could understand the loan terms; and (g) not providing any TILA disclosures, especially notice of her federal right to cancel.

115.    Defendants engaged in such conduct in the course of trade and commerce.

116. They engaged in such conduct with the intent that Ms. Haymer rely on its deception.

117. Moreover, they engaged in gross fraud and deception, and they intended to injure Ms. Haymer. Substantial punitive damages are warranted.

118. Defendants profited from their deception.

119. Defendants have thus been illegally and unjustly enriched by their conduct.

120. Plaintiff was severely damaged as a result and continues to be damaged.

121. Defendants' conduct caused and continues to cause her injuries.

WHEREFORE, plaintiff requests that the Court enter judgment in her favor and against defendants for:

    a.      Compensatory, actual, punitive and other appropriate damages;

    b.      Rescission or reformation of the loan;

    c.      Equitable monetary relief, such as disgorgement of profits;

    d.      Attorney's fees, litigation expenses and costs; and

    e.      Such other or further relief as the Court deems appropriate.

## COUNT V - ILLINOIS FAIRNESS IN LENDING ACT (Discrimination)

122. Plaintiff incorporates by reference paragraphs 1-86. This count is against Countrywide, Valor and Cieslak.

123. The Illinois Fairness in Lending Act also prohibits any residential mortgage lender from "deny[ing] or vary[ing] the terms of a loan on the sole basis of the borrower's race, gender, disability or national origin" or the "geographical location of the real estate."

124.    Plaintiff is an elderly African-American female who lives in a predominantly African-American neighborhood on Chicago's south side.

125.    Based on one or more of these characteristics, defendants perceived her to be vulnerable and, therefore, susceptible to predation.

126.    Defendants (1) impermissibly varied the terms of the loan to defendant solely on the basis of her gender, race and/or the geographical location of her property. They charged her higher closing fee and imposed a YSP resulting in a higher interest rate on average than they charge/give to younger, Caucasian, male applicants from other parts of Chicago.

127.    Defendants (2) intentionally targeted and exploited plaintiff for an improvident loan originated through fraud. Defendants had a pattern and practice of this type of conduct with vulnerable people like Ms. Haymer.

128.    Ms. Haymer qualified for a loan, but the 2009 loan was given on grossly unfavorable terms.

129.    Defendants arrange and/or originate loans on better terms to similarly qualified young, Caucasian, male applicants who live in non-minority neighborhoods in Chicago.

130.    Defendants' conduct violated the Illinois Fairness in Lending Act, 815 ILCS § 120/3.

WHEREFORE, the Court should award plaintiff:

a.    Compensatory and other appropriate damages;

b.    Punitive damages;

c.    Reformation of the loan, disgorgement and/or equitable relief;

d.    Litigation and court costs; and

e.    Such other or further relief as the Court deems appropriate.

## COUNT VI - CIVIL RIGHTS ACT

131.    Plaintiff incorporates by reference paragraphs 1-86 and 122-129.  This count is against Countrywide, Valor and Cieslak.

132.    In connection with plaintiff's 2009 loan, defendants purposefully singled out and exploited plaintiff because of her race, in violation of 42 U.S.C. § 1981.

WHEREFORE, the Court should award defendant:

a.    Compensatory, punitive and other appropriate damages;

b.    Equitable relief;

c.    Litigation and court costs;

d.    Reasonable attorney's fees; and

e.    Such other or further relief as the Court deems appropriate.

## COUNT VII - EQUAL CREDIT OPPORTUNITY ACT

133.    Plaintiff incorporates by reference paragraphs 1-86 and 122-129.  This count is against Countrywide, Valor and Cieslak.

134.    The federal Equal Credit Opportunity Act, 15 U.S.C. §1691, provides:

**(a) Activities constituting discrimination.  It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a  credit transaction--**

**(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . . .**

134.    In connection with plaintiff's loan transaction, defendants violated the ECOA by singling out and exploiting plaintiff with a fraudulent and unaffordable loan because of her age, sex and race and the perceived vulnerability of someone with those characteristics.

WHEREFORE, plaintiff requests that the Court enter judgment in her favor and defendants for:

    a.    Statutory, actual and other appropriate damages;

    b.    Punitive damages;

    b.    Attorney's fees, litigation expenses and costs.

    c.    Such other or further relief as the Court deems appropriate.

### COUNT VIII - FAIR HOUSING ACT

135.    Plaintiff incorporates by reference paragraphs 1-86 and 122-129. This count is against Countrywide, Valor and Cieslak.

136.    The Fair Housing Act ("FHA"), 42 U.S.C. §3605, provides:

**Discrimination in residential real estate-related transactions**

**(a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.**

**(b) "Residential real estate-related transaction" defined. As used in this section, the term "residential real estate-related transaction" means any of the following:**

**(1) The making or purchasing of loans or providing other financial assistance--**

**(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or**

**(B) secured by residential real estate.**

**(2) The selling, brokering, or appraising of residential real property.**

**(c) Appraisal exemption. Nothing in this title prohibits a person engaged in the business of furnishing appraisals of real**

**property to take into consideration factors other than race, color,
religion, national origin, sex, handicap, or familial status.**

137.    In connection with plaintiff's loan, defendants violated the Fair Housing

Act by singling out and exploiting defendant because of her race and sex.

WHEREFORE, plaintiff requests that the Court enter judgment in her favor and

against defendants for:

a.      Compensatory, punitive and other appropriate damages;

b.      Attorney's fees, litigation expenses and costs;

c.      Appropriate equitable relief; and

d.      Such other or further relief as the Court deems appropriate.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
And the Social Justice Project, Inc.,
1525 East 53rd Street, Suite 903
Chicago, Illinois  60615
(773) 241-5844
(773) 241-5845 (FAX)

## JURY DEMAND

Plaintiff demands trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.
Al Hofeld, Jr.