**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HELEN HAYMER, | ) | |
| | ) | |
| Plaintiff, | ) | 10 CV 5910 |
| | ) | |
| v. | ) | Judge Charles P. Kocoras |
| | ) | |
| COUNTRYWIDE BANK, FSB; BANK OF | ) | Magistrate Judge Sheila M. Finnegan |
| AMERICA, N.A.; BAC HOME LOANS | ) | |
| SERVICING, LP f/k/a COUNTRYWIDE HOME | ) | |
| LOANS SERVICING, LP; VALOR FINANCIAL | ) | |
| SERVICES, LLC; MARILYN J. CIESLAK; and | ) | |
| JOHN DOES 1 – 5, | ) | **Jury Demanded** |
| | ) | |
| Defendants. | ) | **Class Action** |

**DEFENDANT BANK OF AMERICA, N.A.'S**
**ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant Bank of America, N.A.[1] ("BANA"), by their attorneys, Bryan Cave LLP,

responds to Plaintiff's Complaint ("Complaint") as follows:

**INTRODUCTION**

1.  Plaintiff Helen Haymer – an elderly, disabled widow on a fixed income –was
    subjected to egregious mortgage loan fraud that has brought her to the brink of
    losing her home of 40 years.

ANSWER:    BANA denies the allegations in this paragraph.

2.  Defendants Valor Financial Services, LLC ("Valor") and Countrywide Bank, FSB
    ("Countrywide" or "the bank"), knowingly made a loan to Ms. Haymer that requires
    her to pay 90% of her monthly income every month for 30 years. Her monthly
    income from Social Security retirement is $1,125.00. Her required monthly payment
    to Countrywide is $1,008.85, inclusive of principal, interest, taxes, hazard insurance

---

[1] Under the provisions of the National Bank Act, Countrywide Bank, FSB and BAC Home Loans Servicing,
LP f/k/a Countrywide Home Loans Servicing, LP merged with and into BANA. BANA is successor by
merger to Countrywide Bank, FSB and BAC Home Loans Servicing, LP. BANA files contemporaneously
with this Answer its *Notice of Merger and Name Change of Certain Defendants.*

and mortgage insurance. The remaining $116.15 is insufficient for Ms. Haymer to purchase food, medicine, utilities and other necessities.

ANSWER:       BANA admits that Plaintiff's monthly payment is $1,085.85. Except as specifically

admitted, BANA denies the allegations in this paragraph.

3.       Valor and Countrywide knew at the time the loan was originated that Ms. Haymer could not afford to repay the loan. They foresaw that the terms of the loan doomed her to default and foreclosure, but the loan was profitable for them, and someone else besides them would bear the risk of default.

ANSWER:       BANA denies the allegations in this paragraph.

4.       In addition, Valor and Countrywide discriminated against plaintiff on the basis of prohibited characteristics, including race, by subjecting her and other minorities to higher interest rates and closing fees, on average, than defendants' non-minority customers.

ANSWER:       BANA denies the allegations in this paragraph.

## JURISDICTION/VENUE

5.       This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal question), 28 U.S.C. § 1337 (interstate commerce), 15 U.S.C. § 1601, et seq. (Truth in Lending Act), 42 U.S.C. § 1981 (Civil Rights Act), 15 U.S.C. § 1691, et seq. (Equal Credit Opportunity Act), and 42 U.S.C. § 3605, et seq. (Fair Housing Act), 12 U.S.C. § 2601, et seq. The Court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367 (supplementary jurisdiction).

ANSWER:       BANA is not contesting jurisdiction.

6.       Defendants all transact business in the Northern District of Illinois and are deemed to reside here.

ANSWER:       BANA admits that it transacts business in the Northern District of Illinois. Except

as specifically admitted, BANA denies the allegations in this paragraph.

## PARTIES

7.     Helen Haymer is 73-year-old widow on a fixed-income who resides in a home that she has owned for nearly 40 years. She is disabled and suffers from diabetes, asthma, hypertension and other chronic ailments. Ms. Haymer is African-American, and her home, located at 7924 South Kimbark Avenue in Chicago, is located in a predominantly African- American neighborhood on Chicago's south side. It is her only property. Ms. Haymer is financially unsophisticated, meek and vulnerable.

ANSWER:     BANA admits that Plaintiff is the owner of record of property located at 7924 South Kimbark Avenue in Chicago (the "Property"), that she was aged 73 at the time of the original Complaint's filing, and that she is African-American. BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph and, therefore, neither admits nor denies the allegations.

8.     Defendant Countrywide is a federally insured savings bank with headquarters located at 1199 N. Fairfax Street, Suite 500, Alexandria, Virginia, 22313. It is a residential mortgage lender that does business throughout the U.S., including in Illinois. Together with Countrywide Home Loans and other affiliates, the bank was the largest home mortgage lender in the U.S. prior to the collapse of the subprime market in 2007. The bank is a subsidiary of Countrywide Financial Corporation ("CFC"), a diversified financial services company, which also does business throughout the U.S., including in Illinois. The bank originated plaintiff's loan, as set forth below.

ANSWER:     BANA admits that Countrywide Bank, FSB originated the Subject Loan. Except as specifically admitted, BANA denies the allegations in this paragraph and further states that Countrywide Bank, FSB no longer exists because it has merged into and became part of BANA.

9.     Defendant Bank of America, N.A. ("BOA"), is a federally chartered bank that, among other things, holds title to residential mortgages, as assignee. It does business in Illinois. It is currently one of the four largest banks in the U.S. BOA is headquartered at 400 National Way, Simi Valley, CA, 93065. In early 2008, BOA acquired the Countrywide group of companies, including Countrywide Bank, FSB, for approximately $4 billion. On information and belief, BOA's acquisition included both Countrywide's assets and its liabilities. On information and belief, BOA is the current assignee or legal and beneficial owner of plaintiff's loan.

ANSWER:     BANA admits that it is a federally chartered bank that holds title to residential mortgages, that it does business in Illinois, that it is currently one of the largest banks in the U.S., and that BANA is the current owner of the Subject Loan. Except as specifically admitted, BANA denies the allegations in this paragraph. BANA further states that Bank of America Corporation acquired the Countrywide group of companies.

10.     Defendant BAC Home Loans Servicing, LP, f/k/a Countrywide Home Loans Servicing, LP ("BAC") is engaged in the business of a loan servicer. BAC services loans originated by the bank and held by BOA. On information and belief, BAC is the current servicer of plaintiff's loan. It does business in Illinois and has a registered agent here.

ANSWER:     BANA admits that BAC Home Loans Servicing, LP was engaged in the business of a loan servicer and further states that BAC Home Loans Servicing, LP merged with and into BANA effective July 1, 2011. Except as specifically admitted, BANA denies the allegations in this paragraph.

11.     Defendant Valor is an Illinois corporation engaged in the business of arranging or brokering residential mortgage loans. It does business in Illinois. Its registered agent and registered agent's address are: Marilyn J. Cieslak, 1911 Rohlwing Road, Suite A, Rolling Meadows, Illinois, 60008. Valor has an office at 399 Quentin Road, #A, Palatine, IL 60067.

ANSWER:     BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and, therefore, neither admits nor denies the allegations.

12.     On information and belief, Cieslak is Valor's sole owner and works as a loan officer or mortgage consultant for Valor. As owner, Cieslak regularly participated in all decisions on whether to extend credit to Valor's customers, including plaintiff. She established –or failed to establish - the policies and procedures according to which Valor set the closing fees and increased interest rates on Valor's customers' loans. Cieslak supervised and is responsible for the conduct of Valor's loan officers in executing those policies. At all times, Cieslak was not only an agent of Valor but its alter ego. Like most mortgage brokers, Valor itself holds few to no assets, is

undercapitalized, and exists merely as a business shell or conduit for its owner to make money.

ANSWER:      BANA lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations in this paragraph and, therefore, neither admits nor denies the allegations.

13.      Countrywide's counsel has identified BOA as the current legal and beneficial owner of plaintiff's loan.  However, because interests in a loan are sometimes transferred even while litigation is pending and without indication in the public record, Does 1-5 are named for any different or additional legal and/or beneficial owners of plaintiff's loan whose identity or identities is/are currently unknown.  Plaintiff will issue a discovery request for information for any additional or new owners.

ANSWER:      BANA admits that its counsel identified BANA as the current owner of the Subject

Loan.  BANA states that the remaining allegations of this paragraph state legal conclusions to which

no response is required.

## FACTS RELATING TO ALL COUNTS

14.      Ms. Haymer purchased her home at 7924 South Kimbark with her husband, now deceased, in 1971, with the assistance of FHA-financing.[2]  She has lived there continuously since then.  Ms. Haymer successfully paid off the mortgage on the home in 2001.  Prior to the loan from defendants in 2009, she had a near-perfect mortgage repayment history.

ANSWER:      BANA lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations in this paragraph and its footnote and, therefore, neither admits nor denies

the allegations.

---

[2] Since its inception, the purpose of the FHA program has been to expand affordable home ownership for Americans continuously since then. Ms. Haymer successfully paid off the mortgage on the home in 2001.

***Defendants Knowingly Originated a Loan to Plaintiff that***
***Took 90% of Her Gross Monthly Income***

15.     In December, 2008, or early January, 2009, Ms. Haymer was referred by an acquaintance to Valor Financial Services for refinancing.  She was seeking relief from an overly burdensome monthly payment amount.

ANSWER:     BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and, therefore, neither admits nor denies the allegations.

16.     Valor had two meetings with plaintiff during this period.  One occurred on or about January 6, 2009.  Both took place in Ms. Haymer's home.  Plaintiff recalls meeting with a Caucasian woman believed to have been Marilyn Cieslak.  Valor was the only entity Ms. Haymer ever dealt with directly concerning the loan.

ANSWER:     BANA admits that Valor was the only entity Ms. Haymer ever dealt with directly concerning the loan.  BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph and, therefore, neither admits nor denies them.

17.     Cieslak filled out plaintiff's initial loan application by hand during or shortly after the first meeting.  Exhibit A is believed to be a copy of the initial application.

ANSWER:     BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and, therefore, neither admits nor denies the allegations.

18.     At this meeting, Cieslak wanted to know what Ms. Haymer's income was. Ms. Haymer showed Ms. Cieslak her Annual Benefit Statement from Social Security, which indicated that she received $1,125.00 monthly.  Ms. Cieslak understood the information and its clear implication for the loan approval process, but she did not include this information when on Exhibit A or any other loan document at anytime.

ANSWER:     BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and, therefore, neither admits nor denies the allegations.

19.     The typewritten application attached as Exhibit B was physically filled out shortly after the initial meeting by Cieslak or Scott Kuhl, another Valor employee whose name appears on Ms. Haymer's loan application.  It was not completed by plaintiff. Cieslak or Kuhl typed information into data fields on a computer at Valor's office and generated a computerized loan application.

ANSWER:     BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and, therefore, neither admits nor denies the allegations.

20.     The entire application process was controlled from start to finish by Valor and by Countrywide, which had a role in preparing the final loan application that plaintiff signed at closing, a copy of which is attached as Exhibit C.

ANSWER:     BANA admits plaintiff signed the application at closing.  Except as specifically admitted, BANA denies the allegations in this paragraph.

21.     Prior to January 14, 2009, Cieslak or Kuhl processed and submitted a completed application to Countrywide.

ANSWER:     BANA admits that someone at Valor processed and submitted a completed application to Countrywide Bank, FSB.

22.     At this point, Countrywide either performed or should have performed verification of Ms. Haymer's ability to repay prior to approving the loan.  Either it did not do so, or, in the alternative, it did so, discovered that her income was insufficient to repay the loan, and approved the loan anyway.  Again in the alternative, as set forth in detail below, Valor was Countrywide's agent or joint venture in plaintiff's transaction, and Countrywide delegated or abdicated to Valor Countrywide's independent obligation to underwrite its loan to plaintiff's ability to repay.

ANSWER:     BANA denies the allegations in this paragraph and further states that the Subject Loan was an FHA-insured "streamline refinance" loan and that, at the time of origination, a streamline refinance loan did not require the lender (or broker) to verify the borrower's income or obtain an appraisal of the property.

23. On or about January 14, 2009, Countrywide's underwriter initially approved a mortgage refinance loan to plaintiff, as indicated by Exhibit D. On January 22, 2009, Countrywide sent a final Loan Approval to Valor. A copy is attached as Exhibit E.

ANSWER: BANA denies the allegations of this paragraph and further states that Exhibit E is unsigned.

24. An appraisal was done on January 18, 2009, as shown in Exhibit F. Exhibits D and E indicate that Countrywide's loan was approved despite a high loan-to-value ratio of over 90%. The property appraised at $175,000; the principal amount of the loan was $157,624.00. On information and belief, the maximum LTV allowable under Fannie Mae guidelines at this time was between 75% and 85%.

ANSWER: BANA admits that an appraisal was conducted on January 18, 2009, that the appraised value of the property was $175,000, and that the loan-to-value ratio was approximately 90%. BANA states that the Fannie Mae guidelines speak for themselves and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or mischaracterizes the contents thereof. Except as specifically admitted, BANA denies the allegations in this paragraph.

25. The loan to plaintiff was an FHA-insured "streamline refinance" loan. FHA's streamline refinance program, at that time, did not require any verification or documentation of borrower income. The type of streamline refinance sub-program for which plaintiff was approved also did not require an appraisal.

ANSWER: BANA admits the allegations of this paragraph.

26. Although this program did not require Valor to verify repayment ability, Valor knew what Ms. Haymer's income was and that she could not afford to repay the loan. Neither Valor nor Cieslak told Ms. Haymer at any time that she could not afford the loan; indeed, their act of proceeding with the loan was an implicit representation to her that she could.

ANSWER: BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and, therefore, neither admits nor denies the allegations.

27.     Following closing, Ms. Haymer learned that her monthly repayment amount under the loan – inclusive of principal, interest, taxes, hazard and mortgage insurance – is $1,049.19.

ANSWER:     BANA denies the allegations of this paragraph and further states that Plaintiff alleges in paragraph 2 of this Second Amended Complaint that her monthly payment is $1,085.85.

28.     Ms. Haymer's only source of income at the time (and now) is Social Security retirement. Her monthly benefit is $1,125.00.

ANSWER:     BANA denies the allegations of this paragraph and further states that Plaintiff apparently receives an additional $1,803.58 every month as part of a lifetime pension benefit.

29.     Thus, at the time Valor arranged and Countrywide originated the loan to Ms. Haymer, the monthly repayment amount on the loan consumed all but $116.15 – or 10% - of her gross monthly income.

ANSWER:     BANA denies the allegations of this paragraph and further states that Plaintiff apparently receives an additional $1,803.58 every month as part of a lifetime pension benefit.

30.     This meant that, if Ms. Haymer chose to pay her mortgage every month, she would have only $116.15 left over to purchase food, medicine, electricity, gas, water, transportation, basic home maintenance and other subsistence items. It would be impossible for her to survive if she opted to make her mortgage payment.

ANSWER:     BANA denies the allegations of this paragraph and further states that Plaintiff apparently receives an additional $1,803.58 every month as part of a lifetime pension benefit.

31.     Defendants' conduct of putting Ms. Haymer in this position or perpetuating the position – where she is forced to choose between keeping a roof over her head or having enough food to eat or medicine for her chronic health problems – was and is unconscionable.

ANSWER:     BANA denies the allegations of this paragraph and further states that Plaintiff apparently receives an additional $1,803.58 every month as part of a lifetime pension benefit.

32. Ms. Haymer did not clearly understand what her monthly payments were going to be. That is because defendants effectively hid the repayment amount and the other loan terms from her in the manner set forth below.

ANSWER: BANA denies the allegations of this paragraph.

33. Valor intentionally and Countrywide intentionally or negligently excluded Ms. Haymer's monthly income during the application and underwriting processes in order to get the loan approved.

ANSWER: BANA denies the allegations of this paragraph.

34. By doing so, they implicitly and fraudulently or negligently represented to Ms. Haymer that she could afford the loan.

ANSWER: BANA denies the allegations of this paragraph.

**Defendants Fraudulently Concealed the Repayment Amount from Plaintiff**

35. Between the time of application and closing, neither Valor nor Countrywide ever provided plaintiff with any preliminary written disclosures of loan terms, such as a Good Faith Estimate of settlement charges, a preliminary Truth in Lending Disclosure Statement or a preliminary 1003 Uniform Residential Loan Application, as required by various state and federal laws.

ANSWER: BANA denies the allegations of this paragraph.

36. These omissions of written disclosures, which prevented Ms. Haymer from discovering the terms of the loan, including the required repayment amount, served to facilitate defendants' underlying fraud of giving her a loan she could not afford to repay.

ANSWER: BANA denies the allegations of this paragraph and further states that the terms of the Subject Loan were disclosed in the loan documents Plaintiff signed at closing.

37.     Valor and the Bank closed on the loan on or about January 26, 2009.

ANSWER:     BANA admits that Plaintiff's loan closed on or about January 26, 2009.


38.     The proceeds of the loan were used primarily for consumer, family and household purposes, namely, refinancing of prior debt incurred for those purposes. Ms. Haymer did not receive any of the proceeds as "cash out."

ANSWER:     BANA admits that plaintiff did not receive any of the proceeds as "cash out."

BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

remaining allegations in this paragraph and, therefore, neither admits nor denies the allegations.


39.     The closing was held in Ms. Haymer's home, not in Schaumburg as represented on the HUD-1 Settlement Statement (Exhibit G). On information and belief, the closing was conducted by an agent of Valor believed to be Cieslak. No closing agent, notary, or Countrywide representative were present at closing.

ANSWER:     BANA admits that a Countrywide representative was not present at the closing.

Except as specifically admitted, BANA denies the remaining allegations of this paragraph.


40.     At the appointed time, Cieslak arrived at Ms. Haymer's home with a single set of closing documents. Ms. Haymer signed them before Cieslak took them all away. Cieslak happened to have extra copies of a mere two of the documents in the stack and gave them to Ms. Haymer. True and accurate reproductions of these two documents are attached as Exhibits B and G.

ANSWER:     BANA denies the allegations of this paragraph.


41.     Apart from these two documents, neither Countrywide nor Valor ever provided to Ms. Haymer, at any time, any copies whatsoever of the loan closing documents.

ANSWER:     BANA lacks knowledge or information sufficient to form a belief as to the truth or

falsity of whether Valor ever provided Plaintiff copies of the loan closing documents other than the

two document described in this paragraph and, therefore, neither admits nor denies the allegations.

BANA further states that had Plaintiff requested the loan closing documents from Countywide Bank, FSB, Countywide Bank, FSB would have provided them to her.

42.     Repeating, Exhibits B and G are the *only* documents Ms. Haymer ever received in connection with the loan. She was never provided with any documents that clearly disclosed the monthly payment amount. The first time she received copies of the note and mortgage was when BAC served her with a foreclosure complaint with copies attached. Those documents are attached hereto as Exhibits H and I, respectively.

ANSWER:     BANA denies the allegation that Exhibits B and G documents were the only documents Plaintiff ever received in connection with the loan. BANA further denies the allegation that Plaintiff was never provided with any documents that clearly disclosed the monthly payment amount. BANA lacks knowledge or information sufficient to form a belief as to when Plaintiff first received copies of the note and mortgage and, therefore, neither admits nor denies the allegations.

43.     Once again, as with the omission of the preliminary loan disclosures, defendants' failure to provide final loan disclosures and other closing documents to Ms. Haymer was intended to prevent her from discovering that she was getting an unaffordable loan. Defendants' lack of disclosure also effectively hid from the effect of defendants' yield spread premium ("YSP")(see below) and the fact of her federal right to cancel the loan within three business days, as set forth below.

ANSWER:     BANA denies the allegations of this paragraph. BANA further states that the terms of the Subject Loan were disclosed in the loan documents Plaintiff signed at closing and that the Court dismissed Plaintiff's Illinois Consumer Fraud Act claim to the extent it relies upon Plaintiff's allegations that Valor Financial Services, LLC was paid an illegal YSP.

44.     Following closing, Countywide transferred servicing rights to BAC, which is believed to be the current servicer of the loan.

ANSWER:     BANA admits that following closing, servicing rights were transferred to BAC Home Loans Servicing, LP. Except as specifically admitted, BANA denies the allegations in this paragraph.

45.     Following closing, Countrywide assigned ownership to BOA, which, on information and belief, is the current legal and beneficial owner.

ANSWER:     BANA admits that Countrywide Bank, FSB assigned ownership of the Subject Loan

to BANA and that BANA is the current owner of the Subject Loan.

### *Defendants Originated a More Costly Loan than Plaintiff Qualified For*

46.     Even if the loan had been affordable on the basis of her income, defendants' greed also drove them to unnecessarily raise the interest rate on Ms. Haymer's loan.

ANSWER:     BANA denies the allegations of this paragraph.

47.     In addition to receiving all significant closing costs (Exhibit G, lines 812 and 813), Countrywide and Valor were compensated generously as a result of Valor's successful effort at jacking up plaintiff's interest rate beyond the "par" rate at which she actually qualified, based upon her objective credit qualifications.

ANSWER:     BANA denies the allegations of this paragraph.

48.     For its part, Countrywide obtained a higher interest rate than the "par" rate at which it was otherwise willing to make the loan, which would lead, in turn, to greater profits, either in the form of higher interest income over time or a greater re-sale value on the secondary market.

ANSWER:     BANA denies the allegations of this paragraph.

49.     For its part, as a reward for its efforts, Valor received from Countrywide a yield spread premium ("YSP") in the amount of $2,167.33. (Exhibit G, line 814). This was Valor's and Cieslak's main compensation for arranging the loan.

ANSWER:     BANA admits that Valor was paid on closing $2,167.33 and further states that Valor

provided a broker credit of $1,537.23 to the borrower to be applied to the closing costs. Except as

specifically admitted, BANA denies the allegations in this paragraph.

50.    Plaintiff was made to finance the amount of the YSP in the form of the higher interest rate she received.  On information and belief, the YSP, which was 1.375% of the loan amount, resulted in a rate that was .5% to 1.0% higher than the rate Ms. Haymer actually qualified for.  The effect of the YSP is documented in attached <u>Exhibit J</u>.

ANSWER:    BANA denies the allegations of this paragraph.  BANA further states that Valor was paid on closing $2,167.33 and was paid a processing fee of $450.00, but that Valor provided a broker credit of $1,537.23 to the borrower to be applied to the closing costs.

51.    As set forth below, defendants charged Ms. Haymer and other persons it perceived to be vulnerable - minorities, women, disabled persons and senior citizens – both higher closing fees and higher YSPs, on average, than they charge their similarly qualified Caucasian, male and younger borrowers.  This practice resulted in higher interest rates, on average, for these disadvantaged groups, which included plaintiff.

ANSWER:    BANA denies the allegations of this paragraph.

### Defendants Were Motivated By Greed for Short-Term Profits

52.    Both defendants stood to reap – and did reap – substantial fees, commissions, profits, and interest income from the origination of the loan (<u>Exhibit G</u>, lines 812-814) but would do so only if the deal went through.

ANSWER:    BANA denies the allegations of this paragraph.  BANA further states that Valor was paid on closing $2,167.33 and was paid a processing fee of $450.00, but that Valor provided a broker credit of $1,537.23 to the borrower to be applied to the closing costs.

53.    For its part, Valor, because it was paid at closing, had no financial incentive whatsoever to care what happened to the loan or Ms. Haymer following closing.

ANSWER:    BANA denies the allegations of this paragraph.

54.     Similarly, Countrywide planned to sell and did sell Ms. Haymer's loan onto the secondary market for cash following closing. In this way, it, too, had little incentive to be concerned about the loan's post-closing level of default risk. If Ms. Haymer could not make her payments, it would be someone else's problem down the line.

ANSWER:     BANA denies the allegations of this paragraph.

55.     In fact, in 2005-2009, Countrywide had a nationwide pattern and practice of encouraging and originating unaffordable loans through its "low documentation" or "stated" programs, loans that required little or no documentation of borrower income. It originated these loans directly, through retail branches, and through its national network of mortgage brokers, such as Valor.

ANSWER:     BANA denies the allegations of this paragraph.

56.     To Valor and Cieslak, plaintiff seemed defenseless, and they took advantage of her perceived vulnerabilities, i.e., her age, sex, disability, status as a widow, and her race/the geographical location of her property. On information and belief, they did the same thing to other minority customers.

ANSWER:     BANA denies the allegations of this paragraph and further states that the refinancing offered to Plaintiff actually lowered her monthly payments.

### *Defendants' Conduct Severely Damaged Plaintiff*

57.     Plaintiff was severely damaged by defendants' conduct and continues to suffer additional damages. For instance, instead of placing plaintiff in a loan she could not afford, defendants could have qualified or referred her for a reverse mortgage or a HAMP loan modification of the terms of her prior loan. Instead, defendants' conduct simply perpetuated plaintiff's injuries for profit.

ANSWER:     BANA denies the remaining allegations of this paragraph and further states that the refinancing offered to Plaintiff actually lowered her monthly payments.

58.     Later, instead of offering to modify her loan, BOA and BAC sought to compound Ms. Haymer's injury by filing a foreclosure action, in violation of FHA regulations that mandate exhaustive loss mitigation efforts. The action is pending in Cook County Circuit Court as *BAC Home Loans Servicing, LP v. Haymer*, 2009 CH 036822.

ANSWER:     BANA admits that it initiated a foreclosure action, entitled *BAC Home Loans Servicing, LP v. Haymer*, 2009 CH 036822, after Plaintiff defaulted on the terms of her mortgage contract. Except as specifically admitted, BANA denies the allegations in this paragraph. BANA further states that there is no private cause of action under FHA regulations for failure to exhaust loss mitigation options.

59.     As a result of defendants' conduct, Ms. Haymer is now on the verge of losing her home, her once-perfect mortgage credit history has been severely damaged, and she has suffered severe emotional and physical distress at the prospect of losing her home.

ANSWER:     BANA denies the allegations of this paragraph.

60.     Ever since she has been unable to make payments and began to worry about losing her home, she has suffered from fitful and interrupted sleep. The worry that she will lose her home has been constantly on her mind during the last two years. Ms. Haymer's blood pressure has been persistently elevated during this period, even though her doctor has increased the dosage of her blood pressure medications.

ANSWER:     BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and, therefore, neither admits nor denies the allegations.

### *Defendants' Loan Was Against Illinois Law, Industry Standards, the Subprime Lending Experience and Guidance from Countrywide's Own Banking Regulator*

61.     By 2009, the practice of underwriting a loan without verifying repayment ability was a known recipe for inevitable default. Similarly, the practice of underwriting based solely on a high LTV was discredited by this time.

ANSWER:     BANA denies the allegations of this paragraph.

62.     It was not only foreseeable that these practices would likely cause injury to the borrower, but defendants' engagement in these practices in January, 2009, openly defied extensive regulatory guidance, industry standards, the pervasive failure of subprime loans, common sense underwriting, and public policy.

ANSWER:        BANA denies the allegations of this paragraph.


63.     The FHA "streamline refinance" program, the "low doc" and "no doc" options of
        Countrywide's subprime heyday, required little-to-no verification of repayment
        ability at the time of plaintiff's loan in January, 2009.[3]

ANSWER:        BANA admits the allegations of this paragraph and the allegation of its footnote that

HUD later changed the FHA-insured "streamline refinance" program to require documentation of

income.   Except as specifically admitted, BANA denies the allegations in this paragraph and its

footnote.   BANA further states that the Subject Loan was an FHA-insured "streamline refinance"

loan and that, at the time of origination, a streamline refinance loan did not require the lender (or

broker) to verify the borrower's income or obtain an appraisal of the property.



64.     However, as alleged above, Cieslak and Valor were aware at all times that plaintiff
        had insufficient income to afford to make repayments on the loan, and they said
        nothing, in spite of the existence of duties to do so, as set forth below.

ANSWER:        BANA lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations in this paragraph and, therefore, neither admits nor denies the allegations.


65.     With respect to Countrywide's role in plaintiff's loan, plaintiff alleges in the
        alternative:  (a) Valor was Countrywide's agent in plaintiff's loan transaction, as
        alleged in detailed below; (b) Countrywide itself exercised no independent due
        diligence to determine whether Ms. Haymer could afford to make repayments under
        the loan; and/or (c) Countrywide had actual information that Ms. Haymer could not

---

[3] Countrywide's programs came to be widely viewed starting in 2008 as vehicles for broker-and lender-driven
fraud. HUD eventually changed the streamline refinance program to require documentation of income in or
about September, 2009.

afford the loan and originated the loan anyway simply because it was profitable for it to do so or because someone else – i.e., the government - would bear the risk.[4]

ANSWER:     BANA denies the allegations of this paragraph.  As to the footnote of this paragraph, BANA admits its first sentence and further states that the guidelines of the FHA program speaks for themselves and, therefore, denies any allegation set forth in the footnote of this paragraph that is inconsistent with or mischaracterizes the contents thereof.

66.     It was impossible for Ms. Haymer to qualify for a loan with a 93% DTI in the absence of either gross fraud and/or negligence by Valor and/or Countrywide.

ANSWER:     BANA denies the allegations of this paragraph and further states that Plaintiff apparently receives an additional $1,803.58 every month as part of a lifetime pension benefit.

67.     Although the FHA streamline refinance program in 2009 did not require defendants to verify income or conduct an appraisal, nevertheless Valor and Countrywide each had an affirmative, legal obligation under FHA regulations to conduct due diligence with respect to all FHA program underwriting in which they engaged.

ANSWER:     BANA denies the allegations of this paragraph.

68.     Under 24 C.F.R. § 203.5(c), Countrywide had a duty to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment" (rather than entirely dependent on FHA's payout of 100% of the loan amount in the event of borrower default).[5]

ANSWER:     BANA states that 24 C.F.R. § 203.5(c) speaks for itself and, therefore, denies any allegation set forth in this paragraph and its footnote that is inconsistent with or mischaracterizes the

---

[4] In addition to the profit incentives alleged above, Countrywide was well aware that FHA/HUD was the guarantor of plaintiff's loan. Under the FHA program, in the event plaintiff defaulted on the loan Countrywide had a federal guarantee of payment for 100% of the indebtedness.

[5] § 203.5(c) applies to direct endorsees, i.e., lenders who have essentially been authorized by HUD to make their own under underwriting decisions using FHA regulations (i.e., without going through the step of submitting applications to HUD). According to HUD, Countrywide was a direct endorsee in 2009.

contents thereof. BANA further states that the Subject Loan was an FHA-insured "streamline refinance" loan and that, at the time of origination, a streamline refinance loan did not require the lender (or broker) to verify the borrower's income or obtain an appraisal of the property.

69.     Moreover, in item 21. B. of the HUD/VA Addendum to Uniform Residential Loan Application, which both Valor and Countrywide signed, the lender was required to certify that "The information contained in the Universal Residential Loan Application and this Addendum was obtained directly from the borrower by an employee of the undersigned lender or its duly authorized agent and is true to the best of the lender's knowledge and belief." Copies are attached in <u>Exhibit K</u>.

ANSWER:     BANA states that Exhibit K speaks for itself and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or mischaracterizes the contents thereof.

70.     Valor's certification to HUD was false in spirit, if not letter, and, on information and belief, Countrywide did nothing to independently verify Ms. Haymer's ability to repay.

ANSWER:     BANA denies the allegations of this paragraph and further states that the Subject Loan was an FHA-insured "streamline refinance" loan and that, at the time of origination, a streamline refinance loan did not require the lender (or broker) to verify the borrower's income or obtain an appraisal of the property.

71.     Countrywide could easily have verified plaintiff's repayment ability – simply by requesting plaintiff's Social Security Benefits Statement, recent bank statements or other documents.

ANSWER:     BANA denies the allegations of this paragraph. BANA further states that Plaintiff apparently receives an additional $1,803.58 every month as part of a lifetime pension benefit, that the Subject Loan was an FHA-insured "streamline refinance" loan, and that, at the time of origination, a streamline refinance loan did not require the lender (or broker) to verify the borrower's income or obtain an appraisal of the property.

72.     Moreover, even if FHA Streamline did not require income verification, Valor's and Countrywide's own underwriting standards may have required something.[6] Even if FHA did not impose such an underwriting requirement or best practice at the time, Valor and Countrywide were free to do so. If Countrywide did not, it was on notice at the time – based upon its regulator's strong advice - that it should have required verification of income.

ANSWER:     BANA denies the allegations of this paragraph. BANA admits the allegation of this paragraph's footnote that it has not produced underwriting requirements for FHA streamline refinance loans and states that such document(s) are not the subject of any pending formal discovery request. BANA further states that the Subject Loan was an FHA-insured "streamline refinance" loan and that, at the time of origination, a streamline refinance loan did not require the lender (or broker) to verify the borrower's income or obtain an appraisal of the property.

73.     Indeed, as one example, although FHA streamline did not require an appraisal in January, 2009, as indicate above defendants took the added measure of having an appraisal done.

ANSWER:     BANA admits that an appraisal was performed on the Property and that the FHA-insured "streamline refinance" loan, at the time of origination, did not require the lender (or broker) to obtain an appraisal of the property.

74.     Consistent with the federal banking agency guidance set forth below and industry experience with dramatically increased levels of delinquency and default stemming from "low" and "no documentation" loans, it was clear to Countrywide in January, 2009, that verifying income was the best practice.

---

[6] Neither Valor nor Countrywide has yet produced their underwriting requirements for FHA streamline refinance loans.

ANSWER:    BANA denies the allegations of this paragraph.  BANA further states that that the

Subject Loan was an FHA-insured "streamline refinance" loan and that, at the time of origination, a

streamline refinance loan did not require the lender (or broker) to verify the borrower's income.


75.    At this time, the government sponsored entities (GSEs), including Fannie Mae, also
required verification of ability to repay for all prime, conforming loans.

ANSWER:    BANA states that guidelines of GSEs, including Fannie Mae, speak for themselves

and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or

mischaracterizes the contents thereof.


76.    In addition, Fannie Mae's maximum DTI ratio for conforming loans was 45%, i.e., a
borrower could not qualify for a mortgage loan unless his or her monthly mortgage
payment combined with other monthly payments was 45% or less of gross monthly
income.

ANSWER:    BANA states that Fannie Mae's guidelines speak for themselves and, therefore,

denies any allegation set forth in this paragraph that is inconsistent with or mischaracterizes the

contents thereof.


### *Countrywide's Own Banking Regulator Had Warned*
### *it for Years Not to Originate Loans Like Plaintiff's*

77.    More fundamentally, for more than a decade, and especially in the wake of the
collapse of the subprime market - which banking regulators and economists widely
attributed to loosened lender underwriting - Countrywide's own federal banking
regulator had repeatedly warned it against making loans without regard to the
borrower's ability to repay.  The Office of Thrift Supervision ("OTS") regulates
Countrywide Bank, FSB.

ANSWER:    BANA denies the allegations of this paragraph.


78.    For instance, on July 10, 2007, once the perils of subprime lending practices had
become widely known by regulators, the OTS and other federal banking regulators

issued a Statement on Subprime Mortgage Lending in which they jointly characterized as a "fundamental consumer protection principles" that loans should be approved "based on the borrower's ability to repay the loan according to its terms" and by "providing information that enables consumers to understand material terms, costs and risks of loan products…." Federal Register, Vol. 72, No. 131, 37569 (July 10, 2007) at 37574.[7] In this case, defendants did neither.

ANSWER:     BANA states that Federal Register, Vol. 72, No. 131, 37569 (July 10, 2007) speaks

for itself and, therefore, denies any allegation set forth in this paragraph and its footnote that is

inconsistent with or mischaracterizes the contents thereof.

79.     The 2007 Statement also advised Countrywide that lending institutions should be able to readily document income for many borrowers and that reduced documentation should be accepted only if mitigating factors are present and well-documented. Id. at 37572, 37573-4. It defined as a "predatory loan" one "based predominantly on the foreclosure or liquidation value of a borrower's collateral rather than on the ability to repay the mortgage according to its terms" or one in which "the lender engage[es] in fraud or deception to conceal the true nature of the mortgage loan origination… from an unsuspecting or unsophisticated borrower," as in plaintiff's transaction. Id. at 37573.

ANSWER:     BANA states that Federal Register, Vol. 72, No. 131, 37569 (July 10, 2007 speaks for

itself and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or

mischaracterizes the contents thereof.

80.     Similarly, on July 30, 2008, the Federal Reserve Board ("FRB") published a final rule containing amendments to Regulation Z and the Home Ownership Equity Protection Act ("HOEPA") - which apply to Countrywide - that addressed many of the same, well-known underwriting problems. Federal Register, Vol. 73, No. 147, 44522 (July 30, 2008). The proposed rules were first published January 9, 2008, a full year before plaintiff's loan was originated. The FRB's summary of the final rules noted that "The recent sharp rise in serious delinquencies on subprime mortgages has made clear that originators were not adequately assessing repayment ability, particularly where mortgages were sold to the secondary market and the originator retained little of the risk." Id. at 44526. The final rule included a prohibition on lending based on the collateral without regard to consumers' ability to repay their

_____

[7] The Statement applies to all banks and their subsidiaries, bank holding companies, savings associations, savings and loan companies and others.

obligations from income. Id. at 44603; 12 C.F.R. § 226.34(a)(4). The FRB indicated that this and other new prohibitions should apply categorically in the subprime market and should be applied on a case-by-case basis in the Alt-A and prime markets. Id. at 44532-3.

ANSWER:    BANA states that Federal Register, Vol. 73, No. 147, 44522 (July 30, 2008) and 12

C.F.R. § 226.34(a)(4) speak for themselves and, therefore, denies any allegation set forth in this

paragraph that is inconsistent with or mischaracterizes the contents thereof.

81.    On October 4, 2006, Countrywide Bank's regulator, the OTS, and other federal banking regulators published Interagency Guidance on Nontraditional Mortgage Product Risks. Federal Register, Vol. 71, No. 58609 (October 4, 2006). Among other things, the guidance advised Countrywide to "ensure that loan terms and underwriting standards are consistent with prudent lending practices, including consideration of a borrower's repayment capacity…." Id. at 58613. The OTS advised that "central to prudent lending is the internal discipline to maintain sound loan terms and underwriting standards despite competitive pressures" and specifically cautioned against "reduced documentation" loans. "As the level of credit risk increases, the Agencies expect an institution to more diligently verify and document a borrower's income…." Id. at 58614.

ANSWER:    BANA states that Federal Register, Vol. 71, No. 58609 (October 4, 2006) speaks for

itself and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or

mischaracterizes the contents thereof.

82.    Earlier on during the subprime boom, in a February 21, 2003, Advisory Letter, Guidelines for National Banks to Guard Against Predatory Lending and Abusive Lending Practices (AL 2003-2), the OCC noted that "a fundamental characteristic of predatory lending" is the extension of credit to "borrowers who simply cannot afford the credit on the terms being offered," noting that "such credit is underwritten predominantly on the basis of the liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms… based on the borrower's current and expected income." In such a situation, the letter continued, "the lender is effectively counting on its ability to seize the borrower's equity in the collateral to satisfy the obligation and to recover the typically high fees associated with such credit." (Id. at 2). "Such disregard of basic principles of loan underwriting lies at the heart of predatory lending." (Id.)

ANSWER:    BANA states that February 21, 2003, Advisory Letter, Guidelines for National Banks to Guard Against Predatory Lending and Abusive Lending Practices (AL 2003-2) speaks for itself and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or mischaracterizes the contents thereof.

83.    On January 31, 2001, Countrywide's regulator, the OTS, and other federal banking regulators published their Expanded Guidance for Subprime Lending Programs, which stated: "Loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound." (At 11).

ANSWER:    BANA states that Expanded Guidance for Subprime Lending Programs speaks for itself and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or mischaracterizes the contents thereof.

84.    Also on October 9, 1999, the OTS and other federal regulators, in their Interagency Guidance on High LTV Residential Real Estate Lending, warned against a higher frequency of default and greater severity of losses associated with high LTV loans (defined as LTV exceeding 90%) and noted that "…the performance of high LTV borrowers has not been tested during an economic downturn when defaults and losses may increase." (At 2).

ANSWER:    BANA states that Interagency Guidance on High LTV Residential Real Estate Lending speaks for itself and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or mischaracterizes the contents thereof.

85.    Finally, at the time plaintiff's loan was originated in January, 2009, the Illinois Fairness in Lending Act specifically prohibited any mortgage lender – whether bank or non-bank - from originating a loan that it knows the borrower cannot afford to repay. 815 ILCS § 120/2(d).

ANSWER:     BANA states that Illinois Fairness in Lending Act speaks for itself and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or mischaracterizes the contents thereof.

86.     These standards provided Countywide and Valor with more than fair notice and warning, regardless of the requirements of the FHA streamline refinance program, that arranging and originating loans without regard to ability to repay was not safe, sound or fair to consumers, especially vulnerable consumers like Ms. Haymer.

ANSWER:     BANA denies the allegations of this paragraph.  BANA further states that the Subject Loan was an FHA-insured "streamline refinance" loan and that, at the time of origination, a streamline refinance loan did not require the lender (or broker) to verify the borrower's income or obtain an appraisal of the property.

87.     Countrywide and Valor were well aware of these standards before and at the time they originated plaintiff's loan.  These were the standards that defendants were being urged or required to follow at that time and that they chose to ignore.

ANSWER:     BANA denies the allegations of this paragraph.  BANA further states that the Subject Loan was an FHA-insured "streamline refinance" loan and that, at the time of origination, a streamline refinance loan did not require the lender (or broker) to verify the borrower's income or obtain an appraisal of the property.

88.     If the standards were not enough, there was extensive experience to draw on by early 2009.  By then, numerous government agency investigations and private studies had linked record default and foreclosure rates to stated income loans, among other characteristics.  But even following the massive failure of stated income loans, defendants gave her such a loan.

ANSWER:     BANA admits that Plaintiff accepted a loan from Countrywide Bank, FSB.  BANA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph and, therefore, neither admits nor denies the allegations

### *Valor Was Countrywide's Agent or Joint Venturer in Plaintiff's Transaction*

89.     In 2009, Countrywide originated a large percentage of its loans through a national network of mortgage brokers with whom it worked closely. In certain internal documents, Countrywide referred to its authorized and approved mortgage brokers as "Business Partners." See, e.g., Exhibit J.

ANSWER:     BANA admits that in 2009, Countrywide Bank, FSB used mortgage brokers in various instances to originate loans. BANA states that Exhibit J speaks for itself and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or mischaracterizes the contents thereof.

90.     Countrywide required brokers that it had accepted as "Business Partners" to cooperate to provide all information, documents and reports it requested so that Countrywide could conduct a review of the broker and its operations.

ANSWER:     BANA admits that Countrywide Bank, FSB had broker agreements to provide funding to prospective qualified borrowers. Except as specifically admitted, BANA denies the remaining allegations in this paragraph.

91.     Countrywide motivated its Business Partners to arrange loans for it through the payment of YSPs and other compensation, without regard to the level of services actually provided by the broker. Countrywide's wholesale loan officers worked one-on-one with Countrywide's Business Partner brokers to cultivate those relationships so that the loan officer and the broker earned greater commissions.

ANSWER:     BANA admits that it compensated mortgage brokers for services rendered. Except as specifically admitted, BANA denies the allegations in this paragraph.

92.     At all times, Valor was an agent of Countrywide in plaintiff's transaction. As agents of Valor, Cieslak and Kuhl were sub-agents of Countrywide.

ANSWER:     BANA denies the allegations of this paragraph.

93.     Indicia of Countrywide's principal-agent relationship with Valor include the following.

ANSWER:     BANA denies the allegations of this paragraph.


94.     In plaintiff's transaction, Countrywide conducted all communications with its borrower, Ms. Haymer, through Valor.  All material representations concerning the terms of Countrywide's loan to plaintiff were made to her by Valor.

ANSWER:     BANA denies the allegations of this paragraph.


95.     Plaintiff provided information for a loan application, including precise and accurate information about her income, to Valor.  Valor accepted the information on Countrywide's behalf and provided the information to Countrywide.

ANSWER:     BANA admits that Valor submitted documents to Countrywide Bank, FSB in connection with Plaintiff's application for a loan.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.


96.     Valor was authorized and directed by Countrywide to complete plaintiff's application on its behalf and to submit it to Countrywide for underwriting.

ANSWER:     BANA admits that Valor submitted documents to Countrywide Bank, FSB in connection with Plaintiff's application for a loan.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.


97.     On information and belief, Countrywide and Valor had a written agreement to do business with each other.[8]  Countrywide contracted with Valor for the purpose of finding and identifying qualified loan applicants and prospective borrowers to whom it could originate loans.

---

[8] Neither Countrywide nor Valor has yet produced a copy of this agreement.

ANSWER:      BANA admits that Countrywide Bank, FSB had a broker agreement with Valor to provide funding to prospective qualified borrowers.  BANA further admits the allegation of this paragraph's footnote that it has not produced a copy of this broker agreement and states that such document(s) are not the subject of any pending formal discovery request.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.

98.      In that agreement, Countrywide specifically authorized Valor to take and accept loan applications, to broker or arrange mortgage loans on its behalf and to counsel, advise and educate applicants.

ANSWER:      BANA admits that Countrywide Bank, FSB had a broker agreement with Valor to provide funding to prospective qualified borrowers.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.

99.      In that agreement, brokers such as Valor were allowed to complete and submit loan applications to Countrywide, which then fully relied on the broker's representations as to the accuracy of the information they contained; Countrywide did little or no independent verification of the information submitted by its authorized brokers.

ANSWER:      BANA admits that Countrywide Bank, FSB had a broker agreement with Valor to provide funding to prospective qualified borrowers.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.

100.      Pursuant to that agreement, Valor tailored its application process to take only that information and those documents that would qualify applicants (or not) for specific loan programs and products offered by Countrywide.

ANSWER:      BANA admits that Countrywide Bank, FSB had a broker agreement with Valor to provide funding to prospective qualified borrowers.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.

101.    In this and other respects, Valor in effect operated as a retail branch of Countrywide.

ANSWER:    BANA admits that Countrywide Bank, FSB had a broker agreement with Valor to provide funding to prospective qualified borrowers.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.

102.    Also pursuant to their written agreement, the Bank authorized Valor to quote and accept Countrywide financing rates and terms to Countrywide's borrowers, to inform credit applicants of their Countrywide financing options and to originate mortgage financing transactions, all by using Countrywide's forms, Countrywide's underwriting criteria, and by requiring adherence to Countrywide's requirements.

ANSWER:    BANA admits that Countrywide Bank, FSB had a broker agreement with Valor to provide funding to prospective qualified borrowers.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.

103.    Countrywide specifically required its brokers, such as Valor, to warrant and represent that all loans would be closed using documents that were either prepared or expressly approved by Countrywide.

ANSWER:    BANA admits that Countrywide Bank, FSB had a broker agreement with Valor to provide funding to prospective qualified borrowers.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.

104.    Pursuant to the written agreement, Valor arranged and processed plaintiff's loan in reliance on and in adherence to Countrywide's credit-granting policies.

ANSWER:    BANA admits that Countrywide Bank, FSB had a broker agreement with Valor to provide funding to prospective qualified borrowers.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.

105.     Moreover, pursuant to that agreement, the Bank and Valor arranged and originated not just plaintiff's loan but a large volume of loans together in the period 2005-2009.

ANSWER:     BANA admits that Countrywide had a broker agreement with Valor to provide funding to prospective qualified borrowers.   BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank, FSB's agent.

106.     In these transactions, Countrywide controlled the ultimate terms of financing granted to the borrower by means of the control it exercised over Valor's compensation:  as in plaintiff's transaction, the higher the interest rate procured by Valor, the greater the compensation paid to it by the Countrywide.   Very often, compensation took the form of yield spread premiums paid to Valor, but Countrywide also regularly authorized Valor and other brokers to impose "processing" and other fees directly on borrowers, such as plaintiff, at closing.

ANSWER:     BANA admits that Countrywide Bank, FSB had a broker agreement with Valor to provide funding to prospective qualified borrowers and that it compensated Valor pursuant to the terms of that agreement.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank FSB's agent.

107.     By virtue of both the business agreement between them and the volume and financial benefits to Valor flowing from the business Countrywide channeled through Valor, Countrywide in fact exercised control and influence over Valor's business practices in all transactions, including plaintiff's.  Its control extended to Valor's practices relating to loan applications, including Valor's verification or disclosure (or not) to Countrywide of borrower repayment ability.   Countrywide could easily have required its brokers to verify and report income in FHA streamline refinance loans in 2009, but it did not.

ANSWER:     BANA admits that Countrywide Bank, FSB had a broker agreement with Valor to provide funding to prospective qualified borrowers and that it compensated Valor pursuant to the terms of that agreement.  BANA denies the remaining allegations in this paragraph and specifically denies that Valor was Countrywide Bank FSB's agent.

108.　　On information and belief, Valor also arranged on Countrywide's behalf for the closing of plaintiff's loan from Countrywide.

ANSWER:　　BANA admits that Valor conducted the closing of Plaintiff's loan.　Except as specifically admitted, BANA denies the remaining allegations of this paragraph.

109.　　In the alternative, Countrywide acted as a joint venturer with Valor to defraud plaintiff through the deceptive and unfair acts and omissions alleged above and below.

ANSWER:　　BANA denies the allegations of this paragraph.

110.　　Defendants jointly undertook, in a one-time grouping or venture, to defraud plaintiff for a commercial or business purpose, i.e., to profit from deceptively and fraudulently inducing Ms. Haymer to take out a loan she could not afford.

ANSWER:　　BANA denies the allegations of this paragraph.

111.　　A community of interest existed among defendants in having plaintiff take out the loan:　they both sought short-term profits at the closing table.

ANSWER:　　BANA denies the allegations of this paragraph.

112.　　Defendants did defraud plaintiff, and they profited from their fraud or reasonably believed they would profit, as explained above.

ANSWER:　　BANA denies the allegations of this paragraph.

113.　　Defendants shared the risk with each other, and they all benefited or believed they would benefit.

ANSWER:　　BANA denies the allegations of this paragraph.

114.     Plaintiff has been damaged, as set forth above.

ANSWER:     BANA denies the allegations of this paragraph.


115.     Defendants' joint venture caused plaintiff's injuries.

ANSWER:     BANA denies the allegations of this paragraph.


## RESPONSE TO COUNT I - ILLINOIS FAIRNESS IN LENDING ACT
### (Improvident Lending)

The Court dismissed Count 1 by order dated July 15, 2011. Accordingly, no answer to Count 1 is required from BANA.


## RESPONSE TO COUNT II – COMMON LAW FRAUD IN THE INDUCEMENT

The Court dismissed Count 2 by order dated July 15, 2011. Accordingly, no answer to Count 2 is required from BANA.


## RESPONSE TO COUNT III – ILLINOIS CONSUMER FRAUD ACT

139.     Plaintiff incorporates by reference paragraphs 1-115, 134 and 138 above as if set forth fully herein. This claim is against Countrywide, Valor and Cieslak.

ANSWER:     BANA adopts and incorporates its responses to paragraphs 1-115, 134 and 138 above as if fully restated herein.


140.     In connection with Ms. Haymer's transaction, defendants violated §2 of the Illinois Consumer Fraud Act, 815 ILCS § 505/2, by engaging in numerous unfair and/or deceptive and/or negligent acts and practices and conduct toward her, including but not limited to: (a) intentionally or negligently arranging or making her a loan without regard to ability to repay; (b) arranging or making a loan that, defendant(s) knew at the time, she could not afford to repay; (c) knowingly or negligently engaging in improvident lending with respect to Ms. Haymer; (d) implicitly misrepresenting to Ms. Haymer, whether intentionally or negligently, that she could afford the loan

when it or they had actual information that she could not; (e) failing to act on the information that she could not afford the loan; (f) failing to engage in due diligence to investigate her ability to repay; (g) making her a loan with insignificant net tangible benefit to her; (h) not providing copies of closing documents from which she could discover the loan terms; and (i) not providing any TILA disclosures, especially notice of her federal right to cancel, which would have alerted her that she could cancel the loan within three business days following closing.

ANSWER:      BANA denies the allegations of this paragraph.


141.      Defendants' practices were unfair, offend public policy, are immoral, unethical, oppressive and unscrupulous, and they caused substantial injury to plaintiff and other consumers.

ANSWER:      BANA denies the allegations of this paragraph.


142.      Defendants engaged in such conduct in the course of trade and commerce.

ANSWER:      BANA denies the allegations of this paragraph.


143.      They engaged in such conduct with the intent that Ms. Haymer rely on their deception/unfairness.

ANSWER:      BANA denies the allegations of this paragraph.


144.      They engaged in gross fraud, deception and unfairness, and with the intent to injure Ms. Haymer. Substantial punitive damages are warranted.

ANSWER:      BANA denies the allegations of this paragraph.


145.      Defendants profited from their deception and unfairness.

ANSWER:      BANA denies the allegations of this paragraph.


146.      Defendants have been illegally and unjustly enriched by their conduct.

ANSWER:  BANA denies the allegations of this paragraph.

147.  Plaintiff was severely damaged by defendants' conduct and continues to suffer additional damages, as alleged above.

ANSWER:  BANA denies the allegations of this paragraph.

WHEREFORE, plaintiff requests that the Court enter judgment in her favor and against defendants for:

a.  Compensatory, actual, punitive and other appropriate damages;

b.  Rescission or reformation of the loan;

c.  Equitable monetary relief, such as disgorgement of profits;

d.  Attorney's fees, litigation expenses and costs; and

e.  Such other or further relief as the Court deems appropriate.

ANSWER:  As for the unnumbered prayer for relief following paragraph 147, no response is required. Should a response be required, BANA denies that Plaintiff is entitled to any of the relief sought in this unnumbered prayer for relief.

## **RESPONSE TO COUNT IV - NEGLIGENT MISREPRESENTATION**

148.  Plaintiff incorporates paragraphs 1 – 115, 134 and 138 above as if fully set forth herein. This claim is against the Countrywide, Valor and Cieslak.

ANSWER:  BANA adopts and incorporates its responses to paragraphs 1-115, 134 and 138 above as if fully restated herein.

149.  In the alternative, defendants, especially Countrywide, negligently misrepresented or overlooked plaintiff's inability to repay when they arranged and underwrote the loan and, consequently, negligently represented to plaintiff that she could afford the loan.

ANSWER:  BANA denies the allegations of this paragraph.

150.     Defendants made the misrepresentations detailed above in their business or professional capacities. All of the misrepresentations were made in a commercial setting and directly to plaintiff. Valor was in the business, at least in part, of supplying information and financial counseling for the guidance of others. On information and belief, as noted Valor's written business agreement with Countrywide required it to provide counseling and educational services to applicants.

ANSWER:     BANA denies the allegations of this paragraph.


151.     In making the misrepresentations, defendants breached certain duties to plaintiff that arose outside of the note and mortgage. This included but is not limited to statutory duties to plaintiff under the Illinois Fairness in Lending Act, the Illinois Consumer Fraud Act and FHA regulations; duties that arose as a result of federal banking agency guidance, as set forth above; and defendants' duties to plaintiff to accurately represent, describe and explain the terms of the loan.

ANSWER:     BANA denies the allegations of this paragraph.


152.     In breaching their duties not to make an unaffordable loan, defendants failed to take precautions against creating an unreasonable risk of injury to plaintiff from foreseen and foreseeable events -- such as her actual inability to make the repayments, her mortgage default, the destruction of her credit, the loss of her home in foreclosure, and her severe emotional and physical distress stemming from the imminent prospect of losing her home.

ANSWER:     BANA denies the allegations of this paragraph.


153.     As a result of defendants' negligent misrepresentations, plaintiff suffered these damages and continues to suffer them.

ANSWER:     BANA denies the allegations of this paragraph.


154.     Plaintiff justifiably relied on defendants' misrepresentations. Defendants knew or could contemplate or foresee that plaintiff would rely on their negligent misrepresentations.

ANSWER:     BANA denies the allegations of this paragraph.

155.     Defendants' conduct was wanton and willful, reckless and malicious, and plaintiff is entitled to an award of punitive damages.

ANSWER:     BANA denies the allegations of this paragraph.


WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a.     Actual and compensatory damages;

b.     The reasonable costs of repair or reformation;

c.     Punitive damages;

d.     Equitable relief other appropriate damages; and

e.     Any other or further relief that the Court deems just.

ANSWER:     As for the unnumbered prayer for relief following paragraph 155, no response is required. Should a response be required, BANA denies that Plaintiff is entitled to any of the relief sought in this unnumbered prayer for relief.


## RESPONSE TO COUNT V - TRUTH IN LENDING ACT

156.     Plaintiff incorporates by reference paragraphs 1 – 115. This Count is against the Countrywide, BOA and John Does 1-5. BAC is named as a necessary party only.

ANSWER:     BANA adopts and incorporates its responses to paragraphs 1-115 above as if fully restated herein.


157.     Countrywide's loan to plaintiff violated the Truth in Lending Act ("TILA"), 15 U.S.C. §1601 et seq. ("TILA"), and Federal Reserve Board Regulation Z, 12 C.F.R. part 226, as follows.

ANSWER:     BANA denies the allegations of this paragraph.

158. Ms. Haymer was not provided with copies to keep of any TILA disclosures whatsoever at any time – including the mandated preliminary and final TILA Disclosure Statements and the required federal Notice of Right to Cancel forms.

ANSWER: BANA denies the allegations of this paragraph.

159. The lack of basic written disclosure of key credit information and basic consumer rights served to obscure the loan terms and the unaffordable repayment amount and to hide from Ms. Haymer the fact that she had a right under federal law to cancel the loan – all for the purpose of preventing her from exercising that right.

ANSWER: BANA denies the allegations of this paragraph.

**Response to Right to Rescind**

160. Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. § 1635 and 12 C.F.R. § 226.23.

ANSWER: This paragraph states a legal conclusion to which no response is required. Should a response be required, BANA denies the allegations in this paragraph.

**Response to Grounds for Rescission**

161. In connection with the loan, Countrywide failed to provide plaintiff with the required financial disclosures at the time the loan was consummated, in violation of 15 U.S.C. Sect. 1637, 12 C.F.R. Sect. 226.18 and the corresponding sections of the Official Federal Reserve Board ("FRB") Commentary on Regulation Z. It failed to provide Ms. Haymer with any final TILA Disclosure Statement at any time.

ANSWER: BANA denies the allegations of this paragraph.

162. In addition, Countrywide did not provide plaintiff with any copies of the federal Notice of Right to Cancel form, in violation of TILA's requirement that this federal right be disclosed "clearly and conspicuously." Countrywide was required to provide two copies for her to keep.

ANSWER: BANA denies the allegations that Plaintiff was not provided with the Notice of Right to Cancel form. The remaining allegations in this paragraph state legal conclusions to which no response is required. Should a response be required, BANA denies the remaining allegations in this paragraph.

163. Either of these two violations alone is sufficient to confer on plaintiff the extended, three-year right to rescind the loan.

ANSWER: This paragraph states a legal conclusion to which no response is required. Should a response be required, BANA denies the allegations in this paragraph.

164. This pleading serves as sufficient notice that plaintiff is rescinding the loan.

ANSWER: This paragraph states a legal conclusion to which no response is required. Should a response be required, BANA denies the allegations in this paragraph.

165. Under 15 U.S.C. Sect. 1641(c), the right to rescind may be exercised against "any assignee," including BOA and John Does 1-5.

ANSWER: BANA denies that there is any legal basis for rescission of the loan. BANA further states that 15 U.S.C. Sect. 1641(c) speaks for itself and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or mischaracterizes the contents thereof.

166. In addition, 15 U.S.C. Sect. § 1635(g) provides:

Additional relief

In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.

ANSWER:     BANA states that 15 U.S.C. Sect. § 1635(g) speaks for itself and, therefore, denies any allegation set forth in this paragraph that is inconsistent with or mischaracterizes the contents thereof.


WHEREFORE, plaintiff requests that the Court enter judgment in her favor and against defendants for:

a.      A judgment voiding her mortgage, capable of recordation in the public records, and binding on defendants;

b.      Refund of all finance charges plaintiff has paid in connection with the loan, pursuant the TILA rescission formula;

c.      Statutory damages for each party's refusal to rescind;

d.      Equitable relief, as appropriate, including but not limited to appropriate time to tender, especially in view of defendants' fraud and improvident lending at origination;

e.      Attorney's fees, litigation expenses and costs; and

f.      Such other or further relief as the Court deems appropriate.

ANSWER:     As for the unnumbered prayer for relief following paragraph 166, no response is required.  Should a response be required, BANA denies that Plaintiff is entitled to any of the relief sought in this unnumbered prayer for relief.


## RESPONSE TO COUNT VI - ILLINOIS FAIRNESS IN LENDING ACT
### (Discrimination)

Count 6 is not directed against BANA.  Accordingly, no answer to Count 6 is required from BANA.

**RESPONSE TO COUNT VII - CIVIL RIGHTS ACT – CLASS CLAIM**

Count 7 is not directed against BANA. Accordingly, no answer to Count 7 is required from BANA.

**RESPONSE TO COUNT VIII - EQUAL CREDIT OPPORTUNITY ACT – CLASS CLAIM**

Count 8 is not directed against BANA. Accordingly, no answer to Count 8 is required from BANA.

**RESPONSE TO COUNT IX - FAIR HOUSING ACT**

Count 9 is not directed against BANA. Accordingly, no answer to Count 9 is required from BANA.

**AFFIRMATIVE DEFENSES**

DEFENSE NUMBER 1

The Subject Loan was an FHA-insured "streamline refinance" loan and that, at the time of origination, a streamline refinance loan did not require the lender (or broker) to verify the borrower's income or obtain an appraisal of the property.

DEFENSE NUMBER 2

Plaintiff's claims are barred, in whole or in part, under the doctrines of estoppel, laches, and/or waiver.

DEFENSE NUMBER 3

To the extent Plaintiff suffered any damages, which BANA denies, such damages were the result of the acts or omissions of third parties over whom BANA had no control.

DEFENSE NUMBER 4

Plaintiff has failed to mitigate her damages.

DEFENSE NUMBER 5

To the extent Plaintiff seeks recovery in tort for economic damages, Plaintiff's claims are barred by the economic loss doctrine.

DEFENSE NUMBER 6

Plaintiff's claims are barred because Plaintiff did not rely upon, or have the right to reasonably or justifiably rely upon, any alleged representations, promises, or statements, whether oral or written, purportedly made by BANA or its predecessors in interest.

DEFENSE NUMBER 7

Plaintiff did not exercise reasonable care to discover any information allegedly concealed or withheld from her.

DEFENSE NUMBER 8

Plaintiff's claims are barred, in whole or in part, by her own negligence.

DEFENSE NUMBER 9

Plaintiff's claims are barred because she materially breached the parties' agreement, including, without limitation, by failing to make her payments on time and other material breaches.

DEFENSE NUMBER 10

The Bank complied with the requirement of all applicable contracts, statutes, regulations, and other laws.

Dated: August 5, 2011                    Respectfully submitted,

                                         DEFENDANT BANK OF AMERICA, N.A.,
                                         SUCCESSOR BY MERGER TO
                                         COUNTRYWIDE BANK, FSB AND BAC HOME
                                         LOANS SERVICING, LP


                                         By: /s/ Rodney Perry
                                         One of Its Attorneys

Rodney Perry, #6275686
Michael J. Werich, #6294060
BRYAN CAVE LLP
161 North Clark Street, Suite 4300
Chicago, Illinois 60601
(312) 602-5000 (tel)
(312) 602-5050 (fax)
rrperry@bryancave.com
michael.werich@bryancave.com


## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing
document was served upon the following counsel of record on August 5, 2011, through the court's
electronic filing system as follows:


        Al Hofeld                   al@alhofeldlaw.com

        James Jacob Lessmeister     jlessmeister@yahoo.com


                                    /s/ Rodney Perry
                                    Rodney Perry